J-S19018-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: B.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3086 EDA 2018 |

Appeal from the Decree Entered, September 19, 2018,
in the Court of Common Pleas of Philadelphia County,
Domestic Relations at No(s): CP-51-DP-1000097-2016.

| | | |
|---|---|---|
| IN THE INTEREST OF: N.M.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: B.M.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3093 EDA 2018 |

Appeal from the Decree Entered, September 19, 2018,
in the Court of Common Pleas of Philadelphia County,
Domestic Relations at No(s): CP-51-AP-0000470-2017.

BEFORE:   LAZARUS, J., KUNSELMAN, J., and STRASSBURGER*, J.

MEMORANDUM BY KUNSELMAN, J.:                    **FILED JUNE 04, 2019**

In this matter, B.M.P. (Mother) appeals the decree terminating her parental rights to her nearly 3-year-old daughter N.M.J., pursuant to the

_____
* Retired Senior Judge assigned to the Superior Court.

Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (8) and (b).[1, 2]  After review, we affirm.

Child came to the attention of the Philadelphia Department of Human Services (DHS) when Mother and Child tested positive for marijuana and cocaine during Child's birth in October 2015.  Mother was unable to care for Child, who was removed from her parents' care and placed in the home of Child's maternal cousin.  Child never lived with her parents for any extended period of time.  Mother continued to test positive for illicit drugs, which led to the Child's dependency adjudication in July 2016.

The juvenile court ordered Mother to seek drug treatment, participate in random drug screens, and visit Child.  The court further ordered her to obtain appropriate housing and complete a parenting program.  Mother never complied with the court-sanctioned reunification plan during the course of the dependency proceedings.

In April 2017, DHS filed a petition to terminate Mother's rights.  The orphans' court conducted a termination hearing on September 19, 2018 and

---

[1] The court also terminated parental rights of L.J. (Father).  Although his appeal is before this panel, it is not consolidated with this matter. ***See*** 3044 EDA 2018; 3045 EDA 2018.

[2] D.P. (Maternal Grandmother) also sought to join this matter.  For reasons we set forth below, we grant the joint application filed by DHS and Child and strike Maternal Grandmother from this appeal.

granted the petition.[3]   Mother filed this timely appeal. She presents two

questions for our review:

> 1. Whether the orphans' court erred by terminating the
>    parental rights of Mother under 23 Pa.C.S.A. §
>    2511(a)(1), (2), (5), (8)?
>
> 2. Whether the orphans' court erred by finding, under 23
>    Pa.C.S.A. § 2511(b), that termination of Mother's
>    parental rights best serves Child's developmental,
>    physical and emotional needs and welfare?

*See* Mother's Brief at 5.

In reviewing an appeal from an order terminating parental rights, we

adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion
> standard when considering a trial court's determination of a
> petition for termination of parental rights. As in dependency
> cases, our standard of review requires an appellate court to
> accept the findings of fact and credibility determinations of
> the trial court if they are supported by the record. *In re:
> R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings
> are supported, appellate courts review to determine if the
> trial court made an error of law or abused its discretion. *Id.*;
> *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion). As

---

[3] We note that the Child was properly represented under 23 Pa.C.S.A. §
2313(a).  In her concise statement to the orphans' court, Mother alleged that
the court erred by vacating Child's legal counsel appointment, which was
originally made to ensure Child's legal interests were properly represented.
*See, e.g., In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017).  At the
beginning of the hearing, Child's guardian *ad litem* advised the court that
Child, who was nearly three years old, was pre-verbal and too young to
articulate a preferred outcome.  *See In re T.S.*, 192 A.3d 1080 (Pa. 2018).
Child's legal counsel concurred with the guardian's assessment.  In its Rule
1925 opinion, the court explained that no separate legal counsel appointment
was necessary pursuant to § 2313(a) and *In re T.S.*  Notably, Mother does
not raise the issue in her brief; although this issue cannot be waived, we
nevertheless agree with the lower court's conclusion.

has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. ***Id.***; ***see also Samuel Bassett v. Kia Motors America, Inc.***, 34 A.3d 1, 51 (Pa. 2011); ***Christianson v. Ely***, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***Id.***

As [the Supreme Court] discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained:

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

***Id.*** (quoting ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

- 4 -

This Court may affirm the trial court's termination of parental rights based on any one subsection of section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Sections 2511(a)(2) and (b) provide, in relevant part, as follows:

§ 2511. **Grounds for involuntary termination**

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for [her] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

Instantly, Mother's first issue concerns the first prong of the termination analysis. We address the court's determination that DHS met its burden under

§ 2511(a)(2), namely that Mother's drug addiction rendered her incapable of parenting.

The Supreme Court has addressed parental incapacity under § 2511(a)(2) as follows:

> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.
>
> *In re Adoption of J.J.*, 515 A.2d 883, 891 (Pa. 1986) (quoting *In re William L.*, 383 A.2d 1228, 1239 (Pa. 1978).

*In re Adoption of S.P.*, 47 A.3d at 827.

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

Here, Mother cites her own testimony to conclude that she made sufficient progress on her reunification goals, that DHS failed to meet its burden, and that the court's findings to the contrary equated an abuse of discretion. *See* Mother's Brief at 11-13. We conclude that the record supports the orphans' court decision to terminate Mother's rights.

Mother had a long history of substance abuse. Two other children were previously removed from her care because of her addiction. During Child's dependency case, Mother participated in five drug treatment programs, but she never successfully completed any of them. *See* N.T., 9/19/18, at 212-214. Other than two screens in May 2016, which were positive for cocaine, marijuana, and alcohol, Mother did not attend court-ordered drug screens. *See* DHS Exhibit 5; N.T. at 28-30.

Mother claims to have satisfied her parenting goal, because she received a certificate for attending a requisite parenting class. *See* Mother's Exhibit at 1. Yet, she ignores the fact that she could not be trusted to care for Child outside of supervised visitation due to her substance abuse. Moreover, Mother attended only about half of the visits offered to her. *See* N.T. at 14; 34; 130; 187; *see also* Footnote 4, *infra.* Of those she attended, Mother arrived late and often left early. *Id.*, at 36.

Mother disputes the court's determination that she failed to meet her housing goal, because she lived with her sister. Here, the record also supports the court's conclusion. But even if Mother achieved stable housing, Mother's inability to achieve sobriety or to visit Child for any significant length of time prevented the court from ordering further reunification. The court did not abuse its discretion when it concluded Mother was incapable of parenting Child. Mother's first issue is without merit.

Having concluded that the court properly applied the first prong of the termination analysis, we turn now to the second prong under section 2511(b),

which is the subject of Mother's second appellate issue. Mother argues that because Child is bonded to her, the termination of the relationship does not best serve the Child's needs and welfare. **See** Mother's Brief at 16-18.

This Court has stated that the initial focus of a termination analysis is on the parent, but the second prong focuses on the child. **See In re Adoption of C.L.G.**, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." **In re K.M.**, 53 A.3d 781, 791 (Pa. Super. 2012). In **In re E.M.**, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. **In re K.M.**, 53 A.3d at 791.

**In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." **In re Z.P.**, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances…where direct observation of the interaction between the parent and the child is not

necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are also a relevant part of this analysis. *See In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of ... her child is converted, upon the failure to fulfill ... her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

Instantly, two DHS caseworkers and two visitation coaches testified at the hearing. Mother relies exclusively on the favorable testimony from the visitation coaches, while ignoring the DHS caseworkers' testimony entirely.

The first visitation coach on Mother's case was Richard Collins. Mr. Collins concluded that, although Mother only attended less than a third of her offered visits, the parental bond was surprisingly strong. *Id.* at 179. He testified that the two act "like there's no missed time, no time lost between them." *Id.*

The other visitation coach was Raymond Nichols. He testified that he supervised about 14, two-hour visits between Mother and Child over the course of the final three months of the dependency case. Visitation Coach

Nichols testified that the parental bond between Mother and Child was "one hundred percent great." *See* N.T. at 187. In fact, the witness testified that he has never seen such preparation on the part of the parent:

> [The parents] set up the room before the child comes in. They know specifically what toys [Child] uses. They know what she eats. They know everything. Like their whole visit is set up like they have a time where their [sic] eating. They have a time where they're learning. They have a time when they're playing. They have a time when they're getting ready, when they're getting cleaned up, when they're ready to go. I've never done a visit where the parents already had everything that they were going to do planned out prior to even getting in the room.

*Id.* at 200.

Mr. Nichols also stated that the parents were asked to walk out with Child to the car after the visit, because Child was upset when the visits ended. *Id.* at 194. The witness concluded that Child would absolutely suffer irreparable harm if the relationship was severed. *Id.* at 188.

In its Rule 1925(a) opinion, the orphans' court did not address the visitation coaches' testimonies. However, the court explicitly noted that it afforded greater weight to the testimony of the DHS' caseworkers. There are ample reasons why the court afforded the visitation coaches' testimonies limited credence.

Mr. Collins' recommendation was not well-reasoned. He testified that he did not consider Mother's illicit drug use and her inpatient addiction treatment to be worthwhile reasons to forbid unsupervised visitations. *Id.* at 183-184. On the other hand, Mr. Nichols did not seem to grasp the concept

of irreparable harm. He testified: "Irreparable harm meaning not physical, but would it (*sic*) emotionally damage the child or would it – you know – sway her to do anything bad or anything like that." ***See id.*** at 189. Although Mr. Nichols had first-hand experience, having been a child whose own parents had their rights terminated, he had no formal education regarding social work, child development, or the like. His degree was in funeral directing. ***Id.*** at 190. Moreover, Mr. Nichols did not know who actually cared for Child, nor did he observe an interaction between the Child and the foster parent. Indeed, neither visitation coach could give an opinion about their bond.

Meanwhile, the DHS caseworkers gave a largely contradictory account. Caseworker Nakeya Plunkett, who had the case first, testified that Mother was offered approximately one hundred total visits during the pendency of the case. Of those, it appears Mother attended fewer than half.[4]

_____

[4] To this Court's frustration, neither the witnesses nor the orphans' court could state precisely how many visits Mother was offered, nor how many she attended. Nevertheless, we can glean from the record the following arithmetic:

Caseworker Plunkett testified that Mother was offered approximately 100 visits during the entire pendency of the case. The supervised visits were weekly and were scheduled for two hours. Caseworker Plunkett testified that Mother attended about 12-15 visits during her time on the case, which was from September 2016 until October or November 2017. ***See*** N.T. at 34; 14. Caseworker Kenisha White took over immediately after Caseworker Plunkett left. Caseworker White did not give an actual figure, but she did testify that she attended three visits and that there was a four month gap between visits from March 2018 to July 2018. ***See id.*** at 130.

When Mother did come to a visit, Caseworker Plunkett testified that Mother often came late and left early. *Id.* at 36. Sometimes Mother confirmed her attendance, only to not show up at all. *Id.* at 37-38. Caseworker Plunkett testified that Mother played with Child for a while, but then became more interested in her phone. *Id.* at 36. Caseworker Plunkett testified that when Child became fussy, Mother did not know how to calm her down or engage her in play. *Id.* Caseworker Kenisha White, who took over for Caseworker Plunkett, testified that she only observed Mother attend three visits. Because Mother arrived late and left early, Caseworker White testified that she probably saw only about 25 minutes of interaction between Mother and Child. *See id.* at 146.

Notwithstanding the competing accounts, the court was within its discretion when it ruled that DHS met the heightened burden when demonstrating that termination was in Child's best interests. We observe that the orphans' court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In Interest of D.F.*, 165 A.3d 960, 966 (Pa. Super. 2017) (citation omitted).

---

Visitation Coach Collins worked on Mother's case from April 2017 to April 2018. He surmised that Mother attended "30%" of her visits. *Id.*, at 179. Visitation Coach Nichols testified that he was assigned to Mother's case in April 2018, and that Mother attended 14 visits between July 2018 and the termination in September 2018. *Id.* at 187.

For one, the visitation coaches' assumptions about the parent-child bond were entirely superficial, and the court acted within its discretion to discount them. The coaches witnessed a happy toddler eat snacks and play with toys with an attentive adult. Mr. Collins testified that when Mother disappeared and reappeared, the Child resumed interacting with her like no time had been lost.

Significantly, the question is not whether Child and Mother have a bond, but whether that bond is worth preserving. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the trial court when determining what is in the best interest of the child. *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (citing In *re K.K.R.–S.*, 958 A.2d 529, 535–536 (Pa.Super.2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *Id.,* 93 A.3d at 897-898; *see also In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the trial court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *Id.* at 898 (citation omitted).

Child resided with the same foster parent, the only caregiver she ever knew. Caseworker White testified that Child is "well-bonded" to the foster parent, that it is evident that they care for each other, that it is the foster

parent who attends to her daily needs. *Id.* at 121-122. For instance, Mother had attended only one of Child's medical appointments. *Id.* at 123.

Since being removed from Mother's care in 2015, Child has not lived with Mother, because Mother's drug addiction necessarily rendered any potential care to be unsafe. Mother's inability to achieve sobriety prevented her from affording Child necessary security and stability, which in turn prevented the creation of a worthwhile parental bond. And while Mother appeared to have been attentive during the final visits, there is no question that only the foster parent provided Child those intangibles essential for her proper development. We conclude that the court did not abuse its discretion by ruling that DHS met its burden under the second prong of the termination analysis. Mother's final issue is without merit.

Finally, we observe that Maternal Grandmother, D.P., evidently joined this appeal and submitted a brief. DHS filed with this Court an application to strike Maternal Grandmother from the matter.

Maternal Grandmother's brief does not include a question involved, but we gather from her argument that she believes she was entitled to a custody hearing under 23 Pa.C.S.A. § 5324(3)(iii)(B) ("Standing for any form of physical custody or legal custody"), because she was a grandparent of a dependent child who was substantially at risk due to parental neglect. Although such a question causes some pause, we must nevertheless grant the application to strike and dismiss Maternal Grandmother's appeal.

Although Child was born in 2015, Maternal Grandmother did not petition the family court to intervene in the dependency matter until 2018. Maternal Grandmother's petition was denied in March 2018, as was her petition for reconsideration in June 2018. On August 16, 2018, the court granted Maternal Grandmother leave to appeal *nunc pro tunc.* That appeal was docketed at 2724 EDA 2018. In November 2018, the Superior Court issued a per curium order dismissing Maternal Grandmother's appeal for failure to comply with the Rules of Appellate Procedure.

While it does not appear to be the case, we cannot resolve whether Maternal Grandmother satisfied § 5324(3)(i) of the Custody Act to warrant a hearing on standing.[5] Having been the subject of her previously dismissed appeal, the issue is now settled. Maternal Grandmother cannot simply revive the matter by joining the instant appeal.

Decree affirmed. Application to strike granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/4/19

---

[5] Section 5324(3)(i) provides that a grandparent may file a custody action if, *inter alia*, the grandparent-child relationship began either with the consent of a parent or under a court order. **See** 23 Pa.C.S.A. § 5324(3)(i).

- 15 -